2016-1011

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

NETLIST, INC.,

Plaintiff-Appellant,

v.

DIABLO TECHNOLOGIES, INC.,

Appellee.

_____

Appeal From the United States District Court
for the Northern District of California
Case No. 4:13-cv-05962-YGR
Hon. Yvonne Gonzalez Rogers

_____

## OPENING BRIEF OF PLAINTIFF-APPELLANT NETLIST, INC.

_____

Sean C. Cunningham
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel: 619.699.2700
Fax: 619.699.2701

_Attorneys for Plaintiff-Appellant_
_Netlist, Inc._

## <u>CERTIFICATE OF INTEREST</u>

NETLIST, INC. v. DIABLO TECHNOLOGIES, INC.
2016-2011

Counsel for Plaintiff-Appellant certifies the following:

1.   The full name of every party or amicus represented by me is:

   Netlist, Inc.

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   N/A

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None.

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   DLA Piper LLP (US):  Sean C. Cunningham, Stanley J. Panikowski, Erin P. Gibson, Rajiv S. Dharnidharka, Ryan W. Cobb; Bartko Zankel, Bunzel & Miller, Simon R. Goodfellow, Benjamin K. Riley, William P. Schuck, Charles G. Towle, Sony B. Barari, Robert H. Bunzel; Oringher, PC, Todd C. Theodora, Roy Z. Silva; Keller Rackauckas Umberg Zipser LLP, Dean J. Zipser

Dated:  December 8, 2015

*/s/ Sean C. Cunningham*
Sean C. Cunningham

# TABLE OF CONTENTS

**Page**

I.      STATEMENT OF RELATED CASES............................................................1

II.     INTRODUCTION ........................................................................................2

III.    STATEMENT OF JURISDICTION .............................................................4

IV.     STATEMENT OF THE ISSUES ..................................................................5

V.      STATEMENT OF THE CASE .....................................................................6

      A.     Netlist's Groundbreaking Invention of the HyperCloud® Memory Module...................................................................................6

      B.     Netlist and Diablo Entered Into a Supply Agreement.........................9

      C.     The Supply Agreement Prohibited Diablo from Using Netlist's Isolation Devices Except to Make Products for Netlist. ...................12

      D.     Diablo Used Netlist's Isolation Devices to Develop a Competing Memory Module for Third Parties. ................................15

      E.     The District Court Interpreted the Supply Agreement to Prohibit Diablo's Use of the Netlist Isolation Devices in the TeraDIMM Prototypes. .......................................................................19

      F.     The District Court Ruled that the Supply Agreement Was Unambiguous and Excluded Any Extrinsic Evidence of Its Meaning.............................................................................................22

      G.     There Was No Factual Dispute at Trial Regarding Diablo's Use of Netlist's Isolation Devices in the TeraDIMM Prototypes. ............23

            1.     Testimony of Diablo VP Cedric Paillard................................23

            2.     Testimony of Diablo CEO Riccardo Badalone........................24

            3.     Testimony of Diablo Engineer Michael Takefman .................25

            4.     Testimony of Diablo Co-Founder Michael Parziale...............26

      H.     The Jury Found In Favor of Diablo on Netlist's Breach of Contract Claim, and the District Court Denied Judgment as a Matter of Law.............................................................................26

VI.     SUMMARY OF ARGUMENT...................................................................28

WEST\264345864

# TABLE OF CONTENTS
## (continued)

**Page**

VII.  ARGUMENT ................................................................................28

    A.  Standard of Review ..........................................................28

    B.  The Meaning of the Supply Agreement Is a Question of Law
        for the Court. ....................................................................30

    C.  The Supply Agreement Unambiguously Prohibited Diablo's
        Use of Netlist's Isolation Devices for Entities Other Than
        Netlist. ...............................................................................31

    D.  It Is Undisputed that Diablo Used Netlist's Isolation Devices
        for Entities Other Than Netlist. ........................................33

    E.  The Court Should Reverse the District Court's Denial of JMOL
        and Related Orders and Remand for Remedy Proceedings. ..............34

VIII.  CONCLUSION ............................................................................36

WEST\264345864

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alaska Lumber & Pulp Co., Inc. v. Madigan*,
   2 F.3d 389 (Fed. Cir. 1993) .........................................................................29, 31

*Badie v. Bank of Am.*,
   67 Cal. App. 4th 779 (1998) ......................................................................30, 31

*Bank of the West v. Superior Court*,
   2 Cal. 4th 1254 (1992) ...................................................................................30

*Grumman Data Sys. Corp. v. Dalton*,
   88 F.3d 990 (Fed. Cir. 1996) ........................................................................29

*Miller v. Glenn Miller Prod., Inc.*,
   454 F.3d 975 (9th Cir. 2006) .....................................................................30, 31

*NavCom Tech., Inc. v. Oki Elec. Indus. Co. Ltd.*,
   No. 5:12-CV-04175-EJD, 2014 WL 991102 (N.D. Cal. Mar. 11, 2014).....30, 31

*nCube Corp. v. SeaChange Int'l, Inc.*,
   436 F.3d 1317 (Fed. Cir. 2006) .....................................................................29

*Newell Cos., Inc. v. Kenney Mfg. Co.*,
   864 F.2d 757 (Fed. Cir. 1988) ......................................................................29

*Pavao v. Pagay*,
   307 F.3d 915 (9th Cir. 2002) ........................................................................29

*Shum v. Intel Corp.*,
   629 F.3d 1360 (Fed. Cir. 2010) .....................................................................34

*So. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*,
   74 Cal. App. 4th 1232 (1999) .......................................................................30

*Summit Tech., Inc. v. Nidek Co., Ltd.*,
   363 F.3d 1219 (Fed. Cir. 2004) .....................................................................29

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Waner v. Ford Motor Co.*,
    331 F.3d 851 (Fed. Cir. 2003) ..................................................................28, 29

*Winet v. Price*,
    4 Cal. App. 4th 1159 (1992) ............................................................................30


**STATUTES**

15 U.S.C. § 1501 ..............................................................................................4

28 U.S.C. § 1295(a)(1).............................................................................5, 9, 17

28 U.S.C. § 1331 ..............................................................................................4

28 U.S.C. § 1338(a) ..........................................................................................4

28 U.S.C. § 1367 ..............................................................................................4

28 U.S.C. § 2201 ..............................................................................................4

28 U.S.C. § 2202 ..............................................................................................4

35 U.S.C. § 256 ................................................................................................4

35 U.S.C. § 262 ................................................................................................4

Cal. Civ. Code § 1636........................................................................................30

Cal. Bus. & Prof. Code § 17200 ........................................................................4


**OTHER AUTHORITIES**

Fed. Cir. R. 47.5 ..............................................................................................1

WEST\264345864

## I.  STATEMENT OF RELATED CASES

The following consolidated appeals from the same civil action were previously pending before this Court:  *Netlist, Inc. v. Diablo Technologies, Inc.*, Fed. Cir. Appeal Nos. 2015-1260, -1274.  These appeals were from the preliminary injunction that the district court granted to plaintiff Netlist in the same underlying case.  Non-parties SanDisk Corporation and SMART Storage Systems, Inc. were the appellants in Appeal No. 2015-1260.  Diablo Technologies, Inc. was the appellant in Appeal No. 2015-1274.  The following judges of this Court issued orders in those appeals:  (1) Judges Prost, Moore (author), and Taranto (February 10, 2015 order); (2) Judge Lourie (March 26, 2015 order); (3) Judges Prost, Reyna, and Wallach (author) (April 2, 2015 order).  The parties consented to dismissal of the appeals after the district court dissolved the preliminary injunction.  This Court accordingly dismissed the appeals in a May 5, 2015 order.

In addition, the parties to this appeal and the non-parties referenced above are all parties to a patent infringement action that has been deemed related to this case under the Civil Local Rules of the Northern District of California:  *Netlist, Inc. v. Smart Storage Systems, Inc.,* Case No. 4:13-CV-5889-YGR (N.D. Cal.).

Counsel for Netlist is not aware of any other related cases under Federal Circuit Rule 47.5.

## II.    INTRODUCTION

This appeal involves the application of unambiguous contract language to undisputed facts.  Plaintiff-Appellant Netlist, Inc. ("Netlist") and Defendant-Appellee Diablo Technologies, Inc. ("Diablo") entered into a Supply Agreement that authorized Diablo to use Netlist's proprietary isolation devices only to manufacture semiconductor products for Netlist.  The contract unambiguously prohibited Diablo from using Netlist's isolation devices for any other purpose.  It is undisputed that Diablo nonetheless used Netlist's isolation devices to develop chips for third-party competitors of Netlist.  Diablo therefore breached the Supply Agreement as a matter of law.

Earlier in the case, the district court entered a preliminary injunction in Netlist's favor on precisely the same grounds argued by Netlist in this appeal.  The court agreed that the contract prohibited Diablo from using Netlist's isolation devices to develop chips for anyone other than Netlist.  The court also recognized Diablo's concession that it had used Netlist's isolation devices to develop chips for entities other than Netlist.  Applying the plain meaning of the contract to the undisputed facts, the district court ruled that Netlist was likely to succeed on its breach of contract claim and entered an injunction to prevent further irreparable harm to Netlist.

As trial got underway, the district court again confirmed that the contract was unambiguous on this point and did not allow the parties to present extrinsic evidence about the contract's meaning at trial.  Accordingly, the jury did not resolve any factual disputes related to contract interpretation.  Nor did the jury resolve any factual disputes about whether Diablo had engaged in conduct that constitutes a breach of the properly-interpreted agreement with respect to this issue.  Rather, Diablo's witnesses freely admitted that they had used Netlist's isolation devices to develop chips for entities other than Netlist.

The jury nonetheless rendered a verdict in Diablo's favor on Netlist's breach of contract claim.  In denying JMOL or a new trial, the district court did not identify any facts emerging from trial that could support a verdict for Diablo under the correct contract interpretation.  Rather, the court failed to apply the contract interpretation it had adopted before trial to the unchanged, undisputed material facts.  The court instead applied a different and incorrect contract interpretation— the only way the jury's verdict on the contract claim could be sustained.

While the factual and procedural history of this case is extensive, the issue on appeal is straightforward:  did Diablo breach the Supply Agreement as a matter of law?  To answer this question, the Court need only correctly interpret the contract, just as the district court did when it entered a preliminary injunction.  The contract is unambiguous and the material facts are undisputed, so review is purely

- 3 -

*de novo*.  Applying the correct contract interpretation to the undisputed facts,

Netlist is entitled to judgment as a matter of law on its breach of contract claim.

This Court therefore should reverse the judgment and remand for a trial on

damages and injunction proceedings.

## III.    STATEMENT OF JURISDICTION

Netlist filed this action against Diablo in July 2013.  A0172-79.  In the

operative Second Amended Complaint, filed in March 2014, Netlist alleged claims

against Diablo for misappropriation of trade secrets, breach of contract, unfair

competition under California's Unfair Competition Law ("UCL"), Cal. Bus. &

Prof. Code § 17200, and correction of inventorship of U.S. Patent No. 8,452,917,

as well as for trademark infringement and false and misleading advertising under

the Lanham Act.  A0180-229.

The district court had subject-matter jurisdiction over this action under 28

U.S.C. §§ 1331, 1338(a), 2201, and 2202 because it involves claims arising under

the patent laws of the United States (specifically 35 U.S.C. § 256 and § 262) and

the Lanham Act, 15 U.S.C. § 1501.  The district court had supplemental

jurisdiction under 28 U.S.C. § 1367 for Netlist's related claims under California

law.

On March 25, 2015, a jury rendered a verdict in Diablo's favor on Netlist's

claims for misappropriation of trade secrets, breach of contract, and correction of

inventorship. A0022-32. The jury found in favor of Netlist on its Lanham Act claims and awarded nominal damages. A0033. On April 24, 2015, the district court ruled in favor of Diablo on Netlist's equitable claim for violation of the UCL based on the jury's verdict. A0016-21. The district court entered final judgment on April 24, 2015. A0001.

The parties then filed post-trial motions. The district court entered orders denying the parties' respective motions seeking judgment as a matter of law and/or a new trial on September 1, 2015. A0002-09; A0162-67. On the same day, the district court also entered an order designating Diablo as the prevailing party for purposes of costs and an order allowing Diablo to recover on the preliminary injunction bond. A0010-15. On September 3, 2015, the district court entered an order taxing costs. A0168-69. Netlist filed a notice of appeal from the judgment and associated orders on September 29, 2015. A0170-71.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1).

## IV.    STATEMENT OF THE ISSUES

The Supply Agreement between Netlist and Diablo unambiguously prohibits Diablo from using Netlist's isolation devices except to make products for Netlist. The undisputed evidence establishes that Diablo used Netlist's isolation devices to make products for entities other than Netlist. Is Netlist therefore entitled to judgment as a matter of law on its breach of contract claim?

- 5 -

## V.    STATEMENT OF THE CASE

### A.    Netlist's Groundbreaking Invention of the HyperCloud® Memory Module.

Netlist is a pioneer in the computer memory industry.  The company started in 2000 with the mission of developing high-performance memory products for computers.  A2116-17; *see also* A0236; A1021.  Major manufacturers such as IBM, HP and Dell have since adopted Netlist's products.  A2117-18; *see also* A0236; A1021.

In 2003, Netlist launched an intensive research and development effort to create a new type of computer server memory technology.  A2121-24; A2129; A2139-41; A2146; *see also* A0128-29; A0236; A1025.   At the time, there was an industry standard for a registered dual in-line memory module ("RDIMM"). A2119-21; *see also* A0129; A0236; A1022-23.  The RDIMM attached to the computer's memory channel, instead of the slower data storage channel.  A2119-21; *see also* A0129; A0236; A1021-22.  It also included a Standard Register attached to at least one rank of physical dynamic random-access memory ("DRAM").  A2121; *see also* A0129; A0236; A1022-23.  Netlist's goal was to create a new type of DIMM that would increase memory capacity and system performance in servers.  A2139-40; *see also* A0128-29; A1025.

- 6 -

The old Standard Register DIMM architecture is depicted below:



A0942; *see also* A2142.

Netlist's work ultimately produced its HyperCloud® memory module. A2129; A2139-41; *see also* A0129; A1025.  Netlist's HyperCloud® memory module appears to a computer system as a standard RDIMM with two ranks of DRAM memory.  A2142-43; *see also* A0129; A0236; A1025-26.  But it is actually a proprietary Load Reduced DIMM ("LRDIMM") with four ranks of DRAM memory.  A2144-45; *see also* A0129; A0236; A1025-26.  Netlist's invention

- 7 -

enabled faster performance and greater capacity while maintaining compatibility with existing computer systems.  A2142-45; *see also* A0129; A1026.

The technologies that underpinned the HyperCloud® module and chipsets included Netlist's load reduction ("LRD") and Netlist's density (or rank) multiplication ("DxD") technologies and related proprietary chipset architectures. A2142-46; *see also* A0129; A0236-37; A1026.  Netlist had developed these critical technologies by 2008.  A2148; *see also* A0129; A1026; A1028.

Netlist's proprietary HyperCloud® architecture is depicted below:



A0945; *see also* A2142; A2146-47; A2257.

Instead of using an industry Standard Register, Netlist's DxD/LRD architecture distributes the data signal and control tasks among a proprietary module controller called the "ASIC" (which includes Standard Register functionality) and nine isolation devices, called the "ISwitches" (and sometimes referred to in this brief and in the record below as "IDs" or "ID chips"). A2142; A2146-47; *see also* A0129; A0237; A1026. Netlist was the first company to design these custom ISwitch isolation devices and use them in a DIMM. A2272; *see also* A0237; A1026.

While the HyperCloud® module provides higher performance and higher density, it operates in a standard DDR3 RDIMM socket located on a computer's "memory channel" or "memory slot." A2258-59; *see also* A0129; A0237; A1025. The HyperCloud® module thus required no change in the computer CPU's Basic Input/Output System (BIOS). A2142-44; *see also* A0237; A1025. It also satisfied the DDR3 data transfer industry standard in effect at the time. A0237; A1025. Yet it produced greater capacity and faster performance. A0237; A1025. Netlist's proprietary isolation devices were essential to this breakthrough in memory technology. A2147; *see also* A1026.

## B.     Netlist and Diablo Entered Into a Supply Agreement.

Seeking a vendor to produce its HyperCloud® memory modules and chipsets in silicon, Netlist began discussions with Diablo in 2008. A2148-49; *see*

WEST\264345864

*also* A0130; A0237; A1027.  As is common in the industry, chip design companies

like Netlist architect and design a chip and then outsource the silicon

implementation to companies like Diablo.  A2148-49; *see also* A0130; A1027.

During those discussions, Diablo indicated it would be interested in

obtaining a license for the DxD/LRD technology.  A2151; *see also* A0130; A0237;

A1027.  Netlist, however, was interested only in an exclusive supply arrangement

for products incorporating its technology.  A2152-53; *see also* A0130; A0237-38;

A1027.

In March 2008, Netlist and Diablo entered into a Mutual Non-Disclosure

Agreement ("NDA") to discuss further the possible collaboration between the two

companies.  A2155; A4771-73; *see also* A0130; A0238; A1027.  The NDA stated

that its purpose was for Netlist and Diablo to "exchange certain Confidential

Information ... for the limited and exclusive purpose of exploring the possibility of

having Diablo embed elements of Netlist's proprietary and patented DxD/LRD

technology into Diablo products, for Netlist's exclusive use (the 'Business

Purpose')."  A2155-56; A4771.  Starting in April 2008, Netlist provided Diablo

with two detailed specifications and a PowerPoint presentation setting forth the

HyperCloud® memory module, entitled "LRD/DxD Chip – Preliminary

Specification; LRD/DxD ASIC Controller" and "Preliminary LRD/DxD Chip

- 10 -

Specification; LRD/DxD Isolation Device." A2157; A4774-841; *see also* A0130; A0238; A1241-42.

Diablo's original draft of the Development and Supply Agreement provided that Diablo would own all rights to the finished product. A4848; *see also* A0130; A0238. Netlist rejected this language and proposed that Diablo's rights be limited to the Diablo Standard Register, as defined. A0130; A0238. Diablo countered by proposing language that it would own all rights to the Diablo Standard Register and "the Netlist Chipset," with Netlist's rights limited to "the Netlist Technology." A4866-67; *see also* A0130; A0238.

Netlist's next proposal, and ultimately the final agreement on this issue, was that Diablo would have rights to the Diablo Standard Register plus "Diablo's implementation of the Netlist Chipset," and Netlist would have rights to "the underlying architecture of the Netlist Chipset, the Netlist Technology and all Intellectual Property Rights embodied in the Netlist Technology." A4888; *see also* A0130-31; A0238. The parties added a definition of "Implementation" to the subsequent draft. A4905-06; *see also* A0238. The parties also added to this draft the clarification in Section 8(a) that "the Netlist Technology is the Confidential Information of Netlist and may not be used for any purpose other than as set forth in this Agreement, including without limitation use of such Netlist Technology to

- 11 -

develop a chip competitive to the Netlist Chipset." A4906; *see also* A0131; A0238.

On September 10, 2008, Netlist and Diablo entered into the Development and Supply Agreement ("Supply Agreement"). A4917-54; *see also* A0131; A0238-39; A1028. The parties agreed that California law would govern the interpretation of the contract. A4927.

### C.    The Supply Agreement Prohibited Diablo from Using Netlist's Isolation Devices Except to Make Products for Netlist.

The Supply Agreement provided that Netlist would retain all rights to:

> (i) its "Netlist Technology," defined as: "Netlist's patented and trade secret protected Rank Multiplication/Load Rank Multiplication technology ('DxD/LRD'), including without limitation its 'know how' and database design technology, developed prior to the Effective Date and provided to Diablo;" and

> (ii) the "Netlist Chipset," defined as: "a DDR3 proprietary chip set solution consisting of a DDR3 standard register (with DxD/LRD physically enabled) and [a] set of isolation devices utilizing the Netlist Technology for use in Netlist RDIMM products implemented in OEM server systems developed under this Agreement in accordance with the Specification."

A4917-18; *see also* A0131; A1028. Netlist's isolation devices are thus part of the "Netlist Chipset."

The Supply Agreement also provided that, upon completion of the project, Diablo would retain ownership rights over the:

> "Diablo Standard Register" or "Register" [which] shall
> mean a DDR3 industry standard register derivative of
> Netlist Chipset with either or both of DxD/LRD
> functionality physically disabled.

A4918; *see also* A0131.

Section 2(e) of the Supply Agreement granted Diablo a license to use the

Netlist Technology only to make products for Netlist.  A4919.  The Netlist Chipset

and Netlist Technology were reserved exclusively for Netlist:

> Diablo shall not sell or manufacture any device
> constituting the Netlist Chipset or Netlist Technology to
> or for any person except Netlist; provided that Diablo
> will be allowed to make, have made, use, design,
> manufacture, distribute and sell to any third party the
> Diablo Standard Register.

A4919; *see also* A0239.

Section 7, "Intellectual Property Rights," confirmed that Netlist owned the

Netlist Chipset and the underlying Netlist Technology, while Diablo owned the

Diablo Standard Register and the techniques Diablo developed in completing the

HyperCloud® silicon implementation:

> (a) Diablo.  All rights, title and interest in and to the
> design and development of the Diablo Standard Register
> and Diablo's Implementation of the Netlist Chipset; and
> any improvement, update, modification or additional
> parts thereof, and all of Diablo's Intellectual Property
> Rights embodied in the Diablo Standard Register, shall at
> all times remain the sole and exclusive property of
> Diablo.  For purposes of this Agreement,
> "Implementation" shall mean the development of a
> silicon chip set using the Netlist Technology (including

- 13 -

without limitation the packaging) which will meet Netlist's Architecture requirements.

(b) Netlist.  All rights, title and interest in and to the design and development of the underlying Architecture of the Netlist Chipset, the Netlist Technology and all Intellectual Property Rights embodied in the Netlist Technology, any improvement, update, modification or additional parts thereof, shall at all times remain the sole and exclusive property of Netlist.  For purposes of this Agreement, "Architecture" shall mean system architecture with regard to Load Reduction and Rank Multiplication modules and DIMM topology.

A4922-23; *see also* A0132; A0239-40.

Finally, section 8(a) of the Supply Agreement sets forth a broad duty of

"Nondisclosure and Nonuse" of the other party's Confidential Information,

concluding by stating:

For purposes of clarification, the Netlist Technology is the Confidential Information of Netlist and may not be used for any purpose other than as set forth in this Agreement, including without limitation use of such Netlist Technology to develop a chip competitive to the Netlist Chipset.

A4923; *see also* A0132; A0240.

Accordingly, the Supply Agreement prohibited Diablo from using Netlist's

isolation devices except to develop products for Netlist.  The Netlist Chipset, as the

name would suggest, includes a set of chips comprising (a) the DDR3 Standard

Register with Netlist's DxD/LRD technology enabled and (b) a set of isolation

devices utilizing the Netlist technology.  The only thing derivative of the Netlist

- 14 -

Chipset that Diablo was permitted to use for other purposes was a DDR3 standard register. A DDR3 standard register does not include any isolation devices—rather, the register and the isolation devices are physically separate devices that are separately listed in the "Netlist Chipset" definition. A4918.

### D. Diablo Used Netlist's Isolation Devices to Develop a Competing Memory Module for Third Parties.

Breaching the Supply Agreement's express terms, Diablo used Netlist's isolation devices to develop products to compete with Netlist's Chipset and HyperCloud® product. Diablo referred to its memory module product as the "TeraDIMM," and SanDisk later sold it as the "ULLtraDIMM." Diablo also referred to two prototypes of the TeraDIMM as the "MegaDIMM" and the "TeraDIMM Lite."

In October 2010, Diablo told investors about its plans for a new TeraDIMM memory module product that would combine DRAM and flash memory. A4955-68; A2746-49; *see also* A0133; A0241. This was more than two years after Diablo entered into the Supply Agreement with Netlist. But Diablo did not make this product for Netlist under the Supply Agreement.

The TeraDIMM memory module uses a module controller, which Diablo calls the "Rush," and nine isolation devices, which Diablo calls the "Bolts." A2272; *see also* A0133; A0241; A0947. The TeraDIMM architecture is depicted below:



A0948.

It is undisputed that Diablo used Netlist's isolation devices to design the Bolt chip used in the TeraDIMM. In a March 2011 presentation, Diablo stated that "TeraDIMM is built on the technology foundation of DDR3 Load Reduction Technology in production today," with a picture of a "Standard DRAM" DIMM labeled as "HyperCloud Memory:"



A5083; *see also* A0133; A0241.

Discussions between Diablo's Chief Executive Officer and Chief Technical Officer compared their proposed Bolt design against Netlist's "ISwitch" design (which Diablo referred to as "ID" for "isolation device"). A4971 ("we will not be stupid like Netlist and require Bolt to absorb trace delay"); A4969 ("are you saying we are okay keeping the power where it is on ID or maybe having it go up?"); *see also* A0133; A0241. In May 2011, a Diablo engineer circulated a presentation entitled "ID → Bolt Modifications" as part of a discussion about "the modifications that needed to be done to the ID to make it work in conjunction with the Rush." A4975 ("[m]odify existing ID to accept RPLL commands … instead of RD … [s]ide band access from Rush"); A0416; *see also* A0133; A0241; A2760-62.

Diablo used Netlist's isolation devices in both TeraDIMM prototypes (the MegaDIMM and TeraDIMM Lite). A1772-73; *see also* A0134. Diablo's use of Netlist's isolation devices in these prototypes allowed Diablo to develop software and firmware, and to test and debug the module, for months before its own Rush

- 17 -

and Bolt chips were ready. A4997-98; *see also* A0133; A1772-73; A0424-27; A0436. The MegaDIMM allowed Diablo to begin software and firmware development, testing, and debugging, as well as to begin design and testing of the logic that would eventually become the Rush chip. A0948; *see also* A0134; A0242. The TerraDIMM Lite was a form of the TeraDIMM that used Netlist isolation devices in addition to the completed Rush chip. A5075; A4747-70; A2795-96; A0431-33; *see also* A0134; A0243. From June to September 2013, Diablo tested the new Rush chip—with the embedded Netlist isolation devices—to expedite the overall development schedule for the TeraDIMM. A0950; *see also* A0134; A0243.

The TeraDIMM module became the product that Diablo's partner SanDisk now sells as the ULLtraDIMM. A0243. Diablo's customer, SMART Storage (owned by SanDisk), uses the Rush and Bolt chips from Diablo as components of the ULLtraDIMM memory module that it sells. A1426-27; *see also* A0133; A0243. The Rush chip "taped out" (*i.e.*, reached the last step in the design phase before going to production) in March 2013, and the working silicon chip was delivered in May 2013. A0134; A0243. The Bolt chip taped out in July or August 2013, with the working silicon chip delivered in September 2013. A0431-32; *see also* A0134; A0243. In June of 2014, the ULLtraDIMM went on sale to the public

- 18 -

through IBM, under the brand name eXFlash.  A2275; *see also* A0133; A0243;

A1038.

> **E.    The District Court Interpreted the Supply Agreement to Prohibit Diablo's Use of the Netlist Isolation Devices in the TeraDIMM Prototypes.**

In October 2014, Netlist moved for a preliminary injunction.  A0230-62.

The district court held two hearings and, on January 6, 2015, granted Netlist's

motion in part.  A109-26.  The court enjoined Diablo and others from

"manufacturing, using, distributing and/or selling the Rush and Bolt integrated

circuits manufactured by or obtained from Diablo, including any such Rush and

Bolt integrated circuits contained in or provided along with the ULLtraDIMM

module, the IBM eXFlash module, or any other product."  A0125.  On January 12,

2015, the court issued an Amended Order Granting In Part Motion for Preliminary

Injunction ("Injunction Order"), which adopted the findings and conclusions of its

January 6 order.  A0127-47.

In the Injunction Order, the district court interpreted the Supply Agreement

to prohibit Diablo's use of Netlist's isolation devices in Diablo's prototypes for its

TeraDIMM module.  The court rejected Diablo's argument that it had the right to

use the Netlist ID chip in developing its prototypes so long as Diablo physically

disabled the load reduction and/or rank multiplication.  The court observed that

- 19 -

"[t]his argument conflates the RD chip with the ID chip, which the evidence indicates are separate."  A0136.

The district court relied on the definitions of the "Netlist Chipset" and "Diablo Standard Register" in the Supply Agreement:

- The "Netlist Chipset" is a "DDR3 proprietary chip set solution consisting of DDR3 standard *register* (with DxD/LRD physically disabled) ***and*** a set of isolation devices utilizing the Netlist Technology," and

- The "Diablo Standard Register" is a "DDR3 *industry standard register* derivative of the Netlist Chipset with either or both of DxD/LRD functionality physically disabled."

A0136, citing A4918 (emphasis in Injunction Order).

The district court observed that, under the Supply Agreement, Diablo's rights are limited to:

- "making and selling a Diablo Standard Register (Supply Agreement §§ 1, 2(e))) and

- make use of the intellectual property it had created in the design and development of the Diablo Standard Register, and in its implementation in silicon of the Netlist Chipset (Supply Agreement § 7)."

WEST\264345864

A0136.  Based on the plain language of the contract, the district court concluded that "while Diablo had the right to use the 'Diablo Standard Register,' that use would at most encompass the RD chip (*i.e.,* the register portion of the Netlist Chipset), not the ID chip (*i.e.*, the ISwitch or isolation device portion of the Netlist Chipset)."  A0136-37.

The district court thus construed "the terms of the Supply Agreement [to] not give Diablo a right to use the designs and technology from ID to build anything, and most particularly not to build a DDR3 module that would compete for use of a computer's Memory channel."  A0137.  The court relied on the exclusivity provisions in Section 2(e)(ii) of the Supply Agreement, which it construed as "only allow[ing] Diablo to sell or manufacture any device constituting the Netlist Chipset *or* Netlist Technology *to Netlist*, unless that device was the Diablo Standard Register, *i.e., only the register portion of the Netlist Chipset.*"  A0137 (emphasis in Injunction Order).  The court concluded:  "By using the RD *and ID* chip in its prototypes, Diablo manufactured and made use of a 'device constituting . . . the Netlist *Technology*,' in terms of architecture, database design, and know-how, even if disabling the DxD/LRD capability meant the device was not the Netlist Chipset."  A0137 (emphasis in Injunction Order).

The district court accordingly recognized that the Supply Agreement prohibited Diablo's use of the Netlist isolation devices in the TeraDIMM

- 21 -

prototypes even if Diablo had physically disabled the load reduction and/or rank multiplication. Because Diablo conceded that it used the Netlist isolation devices in its prototypes, and the only dispute was the irrelevant question whether Diablo had physically disabled the load reduction and/or rank multiplication capabilities, the district court found that Netlist was likely to succeed on its breach of contract claim. A0138.

### F.     The District Court Ruled that the Supply Agreement Was Unambiguous and Excluded Any Extrinsic Evidence of Its Meaning.

On March 10, 2015, the district court ruled that no extrinsic evidence would be admitted to interpret the Supply Agreement because the terms of the contract are unambiguous. After various submissions by the parties and two hearings, the district court issued an Order Regarding Proffers and Extrinsic Evidence Related to Contract Interpretation ("Contract Interpretation Order"). A0148-58. In the Contract Interpretation Order, the court determined that "no party has identified any terms that the Court considers ambiguous." A0149. The court thus ordered that "neither party may offer extrinsic evidence as to the meaning or proper interpretation of the Supply Agreement." A0149.

In the Contract Interpretation Order, the district court also confirmed the prior interpretation of the Supply Agreement underlying its Injunction Order. The court reiterated that "[t]he language of the Supply Agreement limits the Diablo

Standard Register to the 'register' portion of the Netlist Chipset, and does not mention the 'set of isolation devices' or ID chip portion of the Netlist Chipset defined in Section 1 [of the Supply Agreement]."  A0155.

> **G.    There Was No Factual Dispute at Trial Regarding Diablo's Use of Netlist's Isolation Devices in the TeraDIMM Prototypes.**

At trial, it was undisputed that Diablo had used Netlist's isolation devices in the two TeraDimm prototypes—MegaDIMM and TeraDIMM Lite—for 22 months.  Diablo tested, sampled, and sold these prototypes to customers.  In doing so, Diablo significantly accelerated its module product development cycle. Diablo's own witnesses testified to these facts:

> 1.    <u>Testimony of Diablo VP Cedric Paillard</u>

Mr. Cedric Paillard, Diablo's Vice President of Business Development, acknowledged multiple times that the MegaDIMM and TeraDIMM Lite used Netlist's isolation devices.  For instance:

> Q: Okay. And the TeraDIMM Lite actually used the ID chip, correct?
>
> A: They – it does, yes.
>
> Q: Okay. And the MegaDIMM, which you just mentioned a moment ago also used the ID chip, correct?
>
> A: Correct.

A2674-75; *see also* A2708.  Mr. Paillard further acknowledged that Diablo

demonstrated both the MegaDIMM and the TeraDIMM Lite to Original

Equipment Manufacturers ("OEMs").  A2707-08.

### 2.    Testimony of Diablo CEO Riccardo Badalone

Mr. Badalone, Diablo's CEO, also admitted that MegaDIMM used Netlist's

isolation devices:

> Q: So the MegaDIMM included the ID and RD chips
> from the HyperCloud project for Netlist, right?
>
> A: Yes.
>
> Q: And it did that because there was no Rush and Bolt
> chips available at the time, right?
>
> A: That's correct.

A2788.

Mr. Badalone even pointed out the Netlist isolation devices on a sample

MegaDIMM:

> Q: Mr. Badalone, would you point out for the ladies and
> gentlemen where the ID chip from the Netlist
> HyperCloud project is located on the MegaDIMM?
>
> A: So there are nine of them, and one through nine
> (indicating) here.

A2791; *see also* A2792.

WEST\264345864

Mr. Badalone also admitted that:

- Diablo sold TeraDIMM Lites that used the Netlist isolation devices. A2782-83.

- Diablo used the TeraDIMM Lite, with the Netlist isolation devices, to sample to customers (and earned revenue from those samples) and to start software development and testing.  A2801-02.

- Diablo used the Netlist isolation devices without Netlist's permission. A2793.

- Diablo used the Netlist isolation devices for 18 months on the MegaDIMM and four months on the TeraDIMM Lite.  A2795; A2799.

- Diablo's use of the Netlist isolation devices in the prototypes allowed Diablo to advance its TeraDIMM development.  A2792; s*ee also* A2794; A2796; A5075 and related testimony at A2799-800; A973-84 and related testimony at A2760-62.

3.    Testimony of Diablo Engineer Michael Takefman

Diablo engineer Mr. Michael Takefman also testified that the MegaDIMM and the TeraDIMM Lite used the Netlist isolation devices.  A4445-48; A4656; A4664; *see also* A2936-37.

- 25 -

4.     Testimony of Diablo Co-Founder Michael Parziale

Diablo's co-founder and Vice President Michael Parziale also admitted that Diablo used the Netlist isolation devices in both the MegaDIMM and the TeraDIMM Lite.  A3443.

**H.     The Jury Found In Favor of Diablo on Netlist's Breach of Contract Claim, and the District Court Denied Judgment as a Matter of Law.**

As the district court ruled in its Injunction Order, the Supply Agreement unambiguously prohibited Diablo from using Netlist's isolation devices except to make products for Netlist.  Although the court did not specifically instruct the jury with this or any other interpretation, it did not allow the parties to present any extrinsic evidence regarding the meaning of the Supply Agreement.  A1058. Hence, there were no factual disputes relating to contract interpretation at trial. And as described in detail above, it was undisputed that Diablo had used Netlist's isolation devices to make products for third parties unrelated to Netlist.

Nonetheless, on March 25, 2015, the jury returned a verdict in favor of Diablo on Netlist's claims for breach of contract, trade secret misappropriation, and correction of inventorship.  A0022-32.  The district court entered judgment on the verdict and dissolved the preliminary injunction.  A0001; A0159-61.  The court also denied Netlist's motion for judgment as a matter of law or a new trial on its breach of contract claim.  A0002-09.

- 26 -

In denying JMOL, the district court did not identify any facts emerging from trial that would affect the analysis and conclusions underlying its preliminary injunction ruling.  Rather, the court abandoned its prior interpretation of the Supply Agreement.  The district court ruled that the Supply Agreement did not prohibit Diablo from using the Netlist isolation devices in its TeraDIMM prototypes so long as the DxD and/or LRD functionality was disabled in the prototypes.  A0008.  The court then found that "Diablo presented evidence from which the jury reasonably could determine that 'either or both' of the DxD/LRD functionality was physically disabled in the MegaDIMM and TeraDIMM Lite modules."  A0008.  The court concluded:  "Thus the evidence at trial was sufficient for the jury to find that Netlist had failed to show that Diablo 'did something the contract prohibited it from doing.'"  A0008, citing A4109-10.

Again, the evidence was undisputed that Diablo had used Netlist's isolation devices to make products for someone other than Netlist.  The district court did not find otherwise in its JMOL order.  Rather, the court simply reversed course on its interpretation of the Supply Agreement.  The JMOL order therefore hinged entirely on a legal question of contract interpretation.

The district court asserted that its prior determinations in the Injunction Order "were based on a more limited record than was presented at trial."  A0008.  But the court did not explain how the trial record supported its new interpretation

- 27 -

of the Supply Agreement, especially in light of the court's exclusion of any

evidence regarding contract interpretation at trial because the agreement was

unambiguous.  *See* A0148-58.

## VI.  SUMMARY OF ARGUMENT

The district court erred in denying JMOL because the plain contract

language and undisputed facts establish Diablo's breach of the Supply Agreement

as a matter of law.  The Supply Agreement unambiguously prohibits Diablo from

using Netlist's isolation devices to make products for anyone but Netlist.  The

undisputed evidence, including the testimony of four Diablo witnesses, proves that

Diablo used Netlist's isolation devices to make products for entities other than

Netlist.  Netlist thus proved Diablo's breach of the Supply Agreement as a matter

of law, and no reasonable jury could find otherwise.  Applying the correct

interpretation of the contract—a purely legal question reviewed *de novo*—to the

undisputed facts, this Court should reverse the denial of JMOL and remand for

remedy proceedings.

## VII.  ARGUMENT

### A.    Standard of Review

This Court reviews *de novo* an order denying JMOL.  *See Waner v. Ford

Motor Co.*, 331 F.3d 851, 855 (Fed. Cir. 2003).  Under this standard, the district

court's denial of JMOL should be reversed "if the jury's factual findings are not

supported by substantial evidence or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings." *Id.* When reviewing the denial of JMOL after a jury verdict, this Court "applies the same standard of review as that applied by the trial court." *nCube Corp. v. SeaChange Int'l, Inc.*, 436 F.3d 1317, 1319 (Fed. Cir. 2006). Further, "[t]he grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Summit Tech., Inc. v. Nidek Co., Ltd.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004). In the Ninth Circuit, JMOL is required "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

The correct interpretation of a contract is a question of law that this Court likewise reviews *de novo*. *See Alaska Lumber & Pulp Co., Inc. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993). Whether a contract term is ambiguous is also a question of law reviewed *de novo*. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996). And "where the ultimate legal conclusion ... is disputed, but not the underlying facts, there is no issue of fact requiring a trial." *Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 763 (Fed. Cir. 1988) (affirming grant of JNOV after jury verdict on issue of law).

- 29 -

### B.    The Meaning of the Supply Agreement Is a Question of Law for the Court.

The outcome of this appeal turns on this Court's legal interpretation of the Supply Agreement. California law governs this question. A4927. Under California law, the goal of contract interpretation is to give effect to the parties' mutual intent. Cal. Civ. Code § 1636; *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992); *So. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*, 74 Cal. App. 4th 1232, 1240 (1999). "It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." *Winet v. Price*, 4 Cal. App. 4th 1159, 1166 (1992). Contract interpretation is a question of law for the court except when it turns on the credibility of extrinsic evidence. *See, e.g.*, *NavCom Tech., Inc. v. Oki Elec. Indus. Co. Ltd.*, No. 5:12-CV-04175-EJD, 2014 WL 991102, at *7 (N.D. Cal. Mar. 11, 2014); *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 799 (1998); *see also Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 990 (9th Cir. 2006) (where meaning of contract is unambiguous, the court may properly interpret and rule on it as a matter of law).

Here, the district court repeatedly ruled that the Supply Agreement is unambiguous. Moreover, the court excluded from trial any extrinsic evidence bearing on contract interpretation. Netlist does not challenge this evidentiary ruling on appeal. The only question, therefore, is which interpretation of the contract is correct: the one the district court adopted before trial (including when it

- 30 -

granted Netlist's preliminary injunction motion) or the one the district court adopted in denying JMOL after trial.  This is a legal question for the Court to decide.  *See, e.g.*, *NavCom Tech.*, 2014 WL 991102, at *7; *Badie*, 67 Cal. App. 4th at 799; *Miller*, 454 F.3d at 990.  And neither the district court's pre-trial interpretation of the contract nor its post-trial interpretation receives any deference.  *See Alaska Lumber*, 2 F.3d at 392.

## C.    The Supply Agreement Unambiguously Prohibited Diablo's Use of Netlist's Isolation Devices for Entities Other Than Netlist.

The plain language of the Supply Agreement prohibited Diablo from using Netlist's proprietary isolation devices to make products for anyone other than Netlist.  Section 2(e) of the Supply Agreement granted Diablo a limited license to use the Netlist Technology, while reserving the Netlist Chipset and Netlist Technology exclusively for Netlist:

> [T]he Netlist Chipset and Netlist Technology will be exclusive to Netlist in that Diablo shall not sell or manufacture any device constituting the Netlist Chipset or Netlist Technology to or for any person except Netlist; provided that Diablo will be allowed to make, have made, use, design, manufacture, distribute and sell to any third party the Diablo Standard Register.

A4919.  Accordingly, the only component of the Netlist-Diablo partnership that Diablo was permitted to use in making products for third parties was the "Diablo Standard Register."

- 31 -

Under the Supply Agreement's plain terms, the Diablo Standard Register does not include Netlist's isolation devices. Section 1 of the Supply Agreement defines the "Diablo Standard Register" as "a DDR3 industry standard register derivative of Netlist Chipset with either or both of DxD/LRD functionality physically disabled." A4918. By contrast, the "Netlist Chipset" is defined as "a DDR3 proprietary chip set solution consisting of a DDR3 standard register (with DxD/LRD enabled) and set of isolation devices utilizing the Netlist Technology for use in Netlist RDIMM products implemented in OEM server systems developed under this Agreement in accordance with the Specification." A4918. Notably, the words "set of isolation devices" appear nowhere in the definition of "Diablo Standard Register" that defines what Diablo owns under the Supply Agreement.

The Supply Agreement thus identifies the isolation devices as separate and distinct from a DDR3 standard register. If a DDR3 standard register also included the isolation devices, then the parties would not have separately described the "isolation devices" in defining the Netlist Chipset. And if the parties had intended to confer on Diablo a right to use the isolation devices to benefit third parties, they would have expressly granted this right in the Supply Agreement. The contract instead provided that the only component of the Netlist Chipset that Diablo could use for entities other than Netlist is a DDR3 standard register (with either or both of DxD/LRD functionality physically disabled). A4922. Everything else—

- 32 -

including the isolation devices—was reserved exclusively for use by or for Netlist. A4923.  The Supply Agreement thus barred Diablo from using the isolation devices to make products for anyone besides Netlist.

The district court correctly interpreted and applied this plain contract language when it entered a preliminary injunction.  But the court erred by abandoning this interpretation after trial without any basis in fact or law to do so. This Court should now correctly interpret the contract as a matter of law.

> ### D.     It Is Undisputed that Diablo Used Netlist's Isolation Devices for Entities Other Than Netlist.

Diablo does not dispute that it used Netlist's isolation devices to make products for third parties unrelated to Netlist.  (*See* Sections V.D and V.G, *supra*.) In fact, Diablo's witnesses freely admitted this fact at trial.  (*See* Section V.G, *supra*.)  Accordingly, there are no material factual disputes.  Under the district court's original interpretation of the contract—the correct one—Diablo's use of Netlist's isolation devices breached the Supply Agreement.  And as the district court correctly observed in its Injunction Order, it is irrelevant whether Diablo disabled the DxD and/or LRD functionality on the RD chip.  A0136-38.  All that matters is the undisputed fact that Diablo used Netlist's isolation devices for entities other than Netlist.

### E.    The Court Should Reverse the District Court's Denial of JMOL and Related Orders and Remand for Remedy Proceedings.

Because the jury reached an unsupportable conclusion on liability, it had no occasion to determine the amount of damages caused by Diablo's breach of the Supply Agreement.  Accordingly, after applying the plain contract language to the undisputed facts, this Court should order JMOL in Netlist's favor and remand for a trial on damages and other remedy proceedings.

Finally, the district court's orders designating Diablo as the prevailing party for purposes of costs and allowing Diablo to recover on the preliminary injunction bond rest on the same premises as its denial of JMOL.  Netlist therefore asks this Court to vacate those orders for the same reasons outlined above.

As to costs, if Netlist prevails on its breach of contract claim as a matter of law on appeal, then the ruling will have materially "alter[ed] the defendant's behavior in [a] way that significantly benefits the plaintiff."  *Shum v. Intel Corp.*, 629 F.3d 1360, 1367 (Fed. Cir. 2010).  At the very least, it will be appropriate for the district court to reevaluate the magnitude of the parties' respective successes in the litigation on remand.

As to the preliminary injunction bond, the district court's sole reason for allowing Diablo to recover on the bond was "the jury's verdict finding that Diablo did not breach of [sic] the Supply Agreement or Non-Disclosure Agreement." A0014.  If this Court agrees with Netlist that the jury's breach of contract verdict

- 34 -

cannot stand as a matter of law, then there is no basis for the district court's conclusion that "Diablo was wrongfully enjoined or restrained by the preliminary injunction" (A0014), and it was reversible error to allow Diablo to recover on the bond.

## VIII.  CONCLUSION

The relevant provisions of the contract are unambiguous:  Diablo could not use Netlist's isolation devices to build products for anyone other than Netlist.  The material facts are undisputed:  Diablo used Netlist's isolation devices to build chips for customers other than Netlist.  The logically necessary result is judgment as a matter of law for Netlist on its breach of contract claim.  Netlist therefore asks this Court to reverse the judgment for Diablo on Netlist's breach of contract claim, order judgment as a matter of law in Netlist's favor on that claim, and remand the case for proceedings on damages and other remedies.  Because the district court's orders designating Diablo as the prevailing party for purposes of costs and allowing Diablo to recover on the preliminary injunction bond rest on the same premises as its denial of JMOL, Netlist asks this Court to vacate those orders too.

Dated:  December 8, 2015

Respectfully submitted,

*/s/ Sean C. Cunningham*

Sean C. Cunningham
Stanley J. Panikowski
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA  92101-4297
Tel:  619.699.2700
Fax:  619.699.2701

*Attorneys for Plaintiff-Appellant*
*Netlist, Inc.*

- 36 -

## ADDENDUM TO BRIEF

A0001            Judgment

A0002-A0009      Order Denying Netlist's Renewed Motion for Judgment as a
                 Matter of Law and Motion for New Trial

A0010-A0011      Order Re:  Prevailing Party Determination for Purposes of Bill
                 of Costs

A0012-A0015      Order Granting Diablo's Motion to Recover on Preliminary
                 Injunction Bond

A0022-A0033      Verdict Form

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **NETLIST, INC.,** | Case No.: 13-cv-5962 YGR |
| Plaintiff, | **JUDGMENT** |
| vs. | |
| **DIABLO TECHNOLOGIES, INC.,** | |
| Defendant. | |

On March 25, 2015, the jury rendered its verdict in awarding Plaintiff Netlist, Inc. ("Netlist") nominal damages on its claims against Defendant Diablo Technologies, Inc. ("Diablo") under the Lanham Act for trademark infringement and false and misleading advertising. The jury found in favor of Diablo on all other claims submitted to it. On April 24, 2015, based on the verdict, the Court found in favor of Diablo on Netlist's equitable claim for violation of California Business & Professions Code § 17200 et seq. ("UCL"). Therefore,

**IT IS ORDERED, ADJUDGED AND DECREED** that Diablo shall pay to Netlist the sum of $2.00 for liability under the Lanham Act for trademark infringement and false and misleading advertising.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that judgment shall be entered in favor of Diablo and against Netlist, and that Netlist shall take nothing, on its claims for misappropriation of trade secrets, breach of contracts, violation of the UCL, and correction of inventorship of a patent.

**IT IS SO ORDERED.**

Date: April 24, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

A0001

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NETLIST, INC., | Case No.: 13-cv-5962 YGR |
| Plaintiff, | **ORDER DENYING NETLIST'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL** |
| vs. | |
| DIABLO TECHNOLOGIES, INC., | **DKT. NO. 479** |
| Defendant. | |

On March 25, 2015, the jury in this matter returned its verdict which, in part, found in favor of Defendant Diablo Technologies, Inc. ("Diablo") on the claims of Plaintiff Netlist, Inc. ("Netlist") for breach of contract, trade secret misappropriation, and correction of inventorship. (Dkt. No. 420.) After consideration of evidence and arguments on equitable relief, the Court entered judgment in favor of Diablo on these claims on April 24, 2015. (Dkt. No. 459.)

Netlist now brings its Renewed Motion For Judgment As A Matter Of Law pursuant to Rule 50(b), and Motion for a New Trial pursuant to Rule 59. (Dkt. No. 479.) Netlist argues that the Supply Agreement at issue in the breach of contract claim was unambiguous, the facts regarding breach were undisputed, and the Court should have instructed the jury that it had been breached, rather than submitting that issue to the jury. Relying principally on the Court's findings of likelihood of success in connection with Netlist's motion for preliminary injunction, Netlist insists that the Court had already determined that the Supply Agreement was breached. Netlist further contends that the Court's failure to so instruct the jury on the contract claim infected the jury's determination of the trade secret misappropriation claim, requiring a new trial.

The Court has carefully considered the papers submitted and the pleadings in this action, the witnesses' testimony and entire trial record, the arguments of counsel, and the applicable authorities.

Based upon its review, and for the reasons set forth below, the Court **DENIES** Netlist's renewed

motion for judgment as a matter of law and motion for a new trial.

I.    **APPLICABLE STANDARDS**

    **A.    Renewed Motion for Judgment As a Matter of Law**

        Federal Rule of Civil Procedure 50(b) provides that if a court does not grant a motion for

judgment as a matter of law made under Rule 50(a), "the court is considered to have submitted the

action to the jury subject to the court's later deciding the legal questions raised by the motion."  A

party having previously made such a motion "may file a renewed motion for judgment as a matter of

law and may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P.

50(b).  In ruling on the renewed motion, the court may: (1) allow judgment on the verdict; (2) order a

new trial; or (3) direct entry of judgment as a matter of law.  Fed. R. Civ. P. 50(b)(1)-(3).

        In reviewing a renewed motion for judgment as a matter of law, the court must view the

evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its

favor.  *Josephs v. Pacific Bell,* 443 F.3d 1050, 1062 (9th Cir. 2006). "The test applied is whether the

evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's

verdict." *Id.*  "A jury's verdict must be upheld if it is supported by substantial evidence." *Johnson v.

Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001) (emphasis supplied) (further

explaining that "[s]ubstantial evidence is evidence adequate to support the jury's conclusion, even if

it is also possible to draw a contrary conclusion from the same evidence").  The court may not weigh

evidence or order a result it finds more reasonable if substantial evidence supports the jury verdict.

*Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 877 (9th Cir. 1984).  While the court

should review the record as a whole, "it must disregard all evidence favorable to the moving party

that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133,

151 105 (2000).

    **B.    Motion for New Trial**

        In order to grant a motion for new trial under Rule 59, the trial court must find that "the

verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or

to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods.,* 212 F.3d

United States District Court
Northern District of California

2

493, 510 n. 15 (9th Cir. 2000). "Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has the duty ... to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (internal quotation omitted). Thus, in connection with a motion for new trial, "[t]he judge can weigh the evidence and assess the credibility of witnesses, and need not view the evidence from the perspective most favorable to the prevailing party." *Landes Constr., Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1371–72 (9th Cir. 1987) (quoting 11 Wright & Miller, *Fed. Prac. & Proc.* § 2806, at 48–49). While there is no set formula, the Ninth Circuit has held that he Court should grant the motion for new trial "[i]f, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.*; *see also O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1075 (N.D. Cal. 2006) *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007) (same).

## II.    DISCUSSION

### A.    Summary of Pertinent Evidence Presented At Trial

The parties agree, and the evidence is undisputed, that Diablo used the ID chips in two of its prototypes – the MegaDIMM and the TeraDIMM Lite – for 22 months. (*See, e.g.*, Trial Tr. 993:6-7 [Takefman]; Trial Tr. 1447:3-18 [Parziale].) The evidence in the record shows that:

- TeraDIMM Lite, using the Netlist ID chip, was sold to customers. (Trial Tr. 842:20-843:8 [Badalone].)

- Diablo used the TeraDIMM Lite, with the Netlist ID chip, to sample to customers, including receipt of revenues, and to start software development and testing. (Trial Tr. 861:4-862:2 [Badalone].)

- Diablo used the Netlist ID chips without Netlist's permission. (Trial Tr. 853:13-22 [Badalone].)

- Diablo used the Netlist ID chip for 18 months on the MegaDIMM and 4 months on the TeraDIMM Lite. (Trial Tr. 855:9-10; 859:13-15 [Badalone]).

United States District Court
Northern District of California

3

- Diablo's use of the Netlist ID chips in the prototypes allowed Diablo to advance its TeraDIMM development program, including the ability to validate software, emulate the TeraDIMM performance, validate protocol, and develop BIOS, as well as use for marketing, testing performance, and sampling to customers. (Trial Tr. 852:14-17, 854:6-855:10, 856:6-8, 859:9-860:7, 820:22-822:21 [Badalone]; Trial Exh. 118, 135.)

There is also evidence from Diablo, contested by Netlist, concerning the DxD/LRD technology, as follows:

- ID chips on the MegaDIMM could not perform rank multiplication or load reduction because the MegaDIMM only had one rank of DRAM. (Trial Tr. 1232:21-23 [Jansen]; Trial Tr. at 1568:3-11 [Amer].)
- "switching" is not rank multiplication or load reduction since such functionalities require continuous switching between ranks of DRAM, not one-time switches between DRAM and the FPGA. (*Tr.* 1690:8-13 [McAlexander].)
- the ID chips in the TeraDIMM Lite prototypes could not perform load reduction because the TeraDIMM Lite did not include any ranks of DRAM. (Trial Tr. 1569:7-10 [Amer].)
- ID chips on the TeraDIMM Lite did not perform rank multiplication because the pin that instructs on rank multiplication was physically grounded (*i.e.*, disabled). (Trial Tr. 1569:9-14 [Amer].)
- While the RD chips were not disabled, the DxD/LRD functionality was physically disabled. (Trial Tr. 1756:19-24 [McAlexander]; *see also* 1697:1-19, 1701:3-24, 1702:10-1703:19, 1705:22-1706:15 [McAlexander].)

The terms of the Supply Agreement provide that:

- Netlist retained all rights to:

    (i) its "Netlist Technology," defined as: "Netlist's patented and trade secret protected Rank Multiplication/Load Rank Multiplication technology ('DxD/LRD'), including without limitation its 'know how' and database design technology, developed prior to the Effective Date and provided to Diablo;" and

    (ii) the "Netlist Chipset," defined as "a DDR3 proprietary chip set solution consisting of a DDR3 standard register (with DxD/LRD physically enabled) and [a] set of isolation devices utilizing the Netlist Technology for use in Netlist RDIMM

4

products implemented in OEM server systems developed under this Agreement in accordance with the Specification.

(Trial Exh. 53, Supply Agreement 1-2.)

- Diablo retained ownership rights to the:

> 'Diablo Standard Register' or 'Register' [which] shall mean a DDR3 industry standard register derivative of Netlist Chipset with either or both of DxD/LRD functionality **physically disabled**.

(*Id.* at p. 2, emphasis supplied.)

- Diablo retained a license to use the Netlist Technology limited as follows:

> Diablo shall not sell or manufacture any device **constituting the Netlist Chipset or Netlist Technology** to or for any person except Netlist; provided that Diablo will be allowed to make, have made, use, design, manufacture, distribute and sell to any third party the Diablo Standard Register.

(*Id.* at section 2(e), emphasis suppied.)

- The parties' respective "Intellectual Property Rights" were set forth in Section 7:

> (a) Diablo. All rights, title and interest in and to the design and development of the Diablo Standard Register and Diablo's Implementation of the Netlist Chipset; and any improvement, update, modification or additional parts thereof, and all of Diablo's Intellectual Property Rights embodied in the Diablo Standard Register, shall at all times remain the sole and exclusive property of Diablo. For purposes of this Agreement, "Implementation" shall mean the development of a silicon chip set using the Netlist Technology (including without limitation the packaging) which will meet Netlist's Architecture requirements.

> (b) Netlist. All rights, title and interest in and to the design and development of the underlying Architecture of the Netlist Chipset, the Netlist Technology and all Intellectual Property Rights embodied in the Netlist Technology, any improvement, update, modification or additional parts thereof, shall at all times remain the sole and exclusive property of Netlist. For purposes of this Agreement, "Architecture" shall mean system architecture with regard to Load Reduction and Rank Multiplication modules and DIMM topology.

(*Id.* at p. 6.)

Prior to trial, the Court ordered briefing and argument on the question of whether any terms in the Supply Agreement were ambiguous and would require extrinsic evidence in order to interpret

5

them. (Dkt. No. 361; *see also* Dkt. No. 364, 358 [minutes and proposed order submitted by counsel].)  The Court directed each party to identify any terms it believed were ambiguous, and to offer a construction of the term and evidence to support it.

In its response, Netlist took the position that the terms of the Supply Agreement were not ambiguous and did not require construction.  Diablo, for its part, offered a number of terms it contended needed interpretation.  After carefully considering those responses, the Court found that none of the terms identified as ambiguous actually required the Court to determine their construction.  Because the parties did not identify any terms that would require extrinsic evidence to understand, the Court ordered that no extrinsic evidence on the meaning of the terms would be permitted.  (Dkt. No. 386.)

On the breach of contract claim, the Court's instructions as to liability stated as follows:

> There are three elements.  One, that Netlist and Diablo entered into a contract; two, that Diablo did something that the contract prohibited it from doing; and three, that Netlist was harmed by that action.  If you find that Netlist has proved each element, then you must find for Netlist.  If, on the other hand, you find that Netlist has failed to prove any of -- any one of these elements, then you must find for Diablo.

(Trial Tr. 2087:20-2088:3.)  Netlist never requested or proposed any instruction regarding the meaning of the Supply Agreement or any of its terms.  Netlist never objected to the absence of such any instruction on the meaning of the agreement or its terms.[1]

**B.    Renewed Motion for Judgment As a Matter of Law**

Netlist contends that, given the undisputed evidence of Diablo's use of the Netlist ID chips, the Court should have determined the Supply Agreement was breached as a matter of law.  Netlist contends that the contract breach is merely a question of whether Diablo used the ID chips.  This is an oversimplification of the Supply Agreement.

The Supply Agreement permits Diablo to use and sell, a "Diablo Standard Register," which it defines as a "DDR3 industry standard register derivative of Netlist Chipset with either or both of

---

[1]  Rule 51 of the Federal Rules of Civil Procedure provides that a party "may assign as error" a "failure to give a [a jury] instruction, if that party properly requested it and—unless the court rejected the request in a definitive ruling on the record—also properly objected."  Fed. R. Civ. P. 51(d)(2).

United States District Court
Northern District of California

1   DxD/LRD functionality physically disabled." (Trial Exh. 53, Supply Agreement § 2(e).) The

2   Supply Agreement limits Diablo's ability to sell or manufacture any device "constituting" the Netlist

3   Chipset or Netlist Technology, both of which are defined to include DxD/LRD functionality and, in

4   the case of the Netlist Chipset, the DxD/LRD functionality had to be physically enabled. (Trial Exh.

5   53, Supply Agreement § 2(e), and p. 2.) Diablo presented evidence from which the jury reasonably

6   could determine that "either or both of" the DxD/LRD functionality was physically disabled in the

7   MegaDIMM and TeraDIMM Lite modules. Thus, the evidence at trial was sufficient for the jury to

8   find that Netlist had failed to show that Diablo "did something the contract prohibited it from doing."

9   (Trial Tr. 2087:20-2088:3.)

10          The Court's prior determinations in connection with the preliminary injunction were based on

11   a more limited record than was presented at trial. Netlist's implicit reliance on that preliminary

12   determination does not preclude the jury from finding differently, based on the trial record. The

13   Court must draw all reasonable inferences in favor of upholding the jury's verdict. Netlist has not

14   offered a sufficient basis to disturb the jury's verdict on the breach of contract claims.[2]

15          **C.    Motion for New Trial**

16          Netlist argues that a new trial is warranted because the submission of the contract claim to the

17   jury infected the verdict. Netlist contends that the Court should have instructed the jury that Diablo

18   had breached the contract, and failure to do so meant that the jury could not render its verdict

19   properly. In Netlist's estimation, the "clear weight of the evidence" proved that Diablo breached the

20   contracts by using the Netlist ID chips, and the Court should order a new trial on the contract claims

21   as well as the trade secret misappropriation claim.

22          The Court has given a careful review to the evidence presented at trial and the parties'

23   arguments herein. Based such review, the Court is not left with the "definite and firm conviction"

24   that the jury's decision was mistaken or against the weight of the evidence. As stated above, Diablo

25   presented evidence countering Netlist's theory of breach. In particular, Diablo presented evidence

26   _____

27          [2] Because the Court finds that the jury's factual determination should not be disturbed, the
    Court does not reach Diablo's argument that the jury's verdict should be upheld for the further
28   reason that, as a matter of law, exceeding the scope of a license agreement does not constitute a
    breach of contract. Likewise, the Court does not reach Netlist's unsupported, after-thought argument
    that Diablo's use of the ID chip also breached the parties Non-Disclosure Agreement.

7

United States District Court
Northern District of California

that DxD/LRD *functionality* was physically disabled in the prototypes. Such evidence would support

a finding that Diablo's undisputed use of the ID chips was not something the Supply Agreement

precluded it from doing, and therefore no breach was shown. In light of this testimony, the Court

cannot find that the jury's verdict is contrary to the clear weight of the evidence here.

**III. CONCLUSION**

For the foregoing reasons, Netlist's Motion For Judgment As A Matter Of Law and Motion

For a New Trial are **DENIED**.

This Order terminates Dkt. No. 479.

**IT IS SO ORDERED.**

Date: September 1, 2015

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

8

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **NETLIST, INC.,**<br><br>Plaintiff,<br><br>vs.<br><br>**DIABLO TECHNOLOGIES, INC.,**<br><br>Defendant. | Case No.: 13-cv-5962 YGR<br><br>**ORDER RE: PREVAILING PARTY DETERMINATION FOR PURPOSES OF BILL OF COSTS**<br><br>**(DKT. NO. 471, 481, 483, 484)** |

Plaintiff Netlist, Inc. ("Netlist") filed its Bill of Costs (and Amended Bill of Costs) on the contention that, as a plaintiff that obtained some relief on some of its claims, it is a prevailing party entitled to its costs. Relying on the U.S. Supreme Court's decision in *Farrar v. Hobby*, 506 U.S. 103, 113 (1992), Netlist argues that where there is a mixed verdict with only some successes by the plaintiff, even if it is only awarded nominal damages, the plaintiff is the prevailing party.

Defendant Diablo Technologies, Inc. ("Diablo") objects that Netlist prevailed only on its two Lanham Act claims, obtained only nominal damages of one dollar on each of those claims, and lost on all significant claims in the litigation. Thus, it is not a prevailing party and is not entitled to costs.

There can only be one prevailing party in any given case. *Shum v. Intel Corp.*, 629 F.3d 1360, 1367 (Fed. Cir. 2010). It is true that "a plaintiff who wins nominal damages is a prevailing party." *Farrar*, 506 U.S. at 112-113. In *Farrar*, the civil rights plaintiff proved a Constitutional violation, but did not establish damages proximately caused by that violation, and so was awarded only nominal damages on his claims. *Id.* at 107-08. However, the *Farrar* case did not address a mixed verdict situation.

"[A] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly

United States District Court
Northern District of California

United States District Court
Northern District of California

1  benefits the plaintiff." *Farrar*, 506 U.S. at 111-12.  There is no question that nominal damages

2  constitute "actual relief on the merits… materially alter[ing] the legal relationship between the

3  parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Id.*

4  "Rule 54(d) has no special rule or exception for mixed judgment cases, where both parties have some

5  claims decided in their favor." *Shum*, 629 F.3d at 1367.  However, in a mixed judgment case, the

6  Court must examine the parties' respective successes to determine which one of the two is the

7  prevailing party.  *Id.*  If plaintiff's success is only limited and does not alter the defendant's behavior

8  in any way that significantly benefits the plaintiff, it is not the prevailing party.  *Id.* at 1368-69.

9       Here, the Court has considered and denied Diablo's motion for judgment as a matter of law

10  on Netlist's Lanham Act claims.  Thus, Netlist succeeded on those claims.  However, that success is

11  only of limited significance, given that the conduct on which it was based was discontinued years

12  ago and has no forward-looking effect on the parties.  It does not alter Diablo's behavior in any

13  significant way.  Further, the significant successes here were in favor of Diablo, which prevailed on

14  the breach of contract and misappropriation of trade secret claims, as well as the correction of

15  inventorship claim.

16       Based on an examination of the parties' respective successes, the Court finds that Diablo is

17  the prevailing party in this action for purposes of Rule 54 of the Federal Rules of Civil Procedure.

18       The Clerk of the Court is directed to proceed with consideration of Diablo's Amended Bill of

19  Costs (Dkt. No. 481) and any objections thereto.

20       **IT IS SO ORDERED.**

21  Date: September 1, 2015

22  _____
    **YVONNE GONZALEZ ROGERS**
    **UNITED STATES DISTRICT COURT JUDGE**

23

24

25

26

27

28

2

United States District Court
Northern District of California

1

2

3

4

5

6

7    **UNITED STATES DISTRICT COURT**

8    **NORTHERN DISTRICT OF CALIFORNIA**

9

10   **NETLIST, INC.,**                                 Case No.: 13-cv-5962 YGR

11         Plaintiff,                                   **ORDER GRANTING DIABLO'S MOTION TO**
                                                        **RECOVER ON PRELIMINARY INJUNCTION**
12         vs.                                          **BOND  (DKT. NO. 465)**

13   **DIABLO TECHNOLOGIES, INC.,**

14         Defendant.

15

16        Defendant Diablo Technologies, Inc. ("Diablo") moves the Court for an order requiring

17   Netlist, Inc. ("Netlist") to pay Diablo the full amount of the preliminary injunction bond.  (Dkt. No.

18   465.)  In connection with its January 12, 2015 Amended Order Granting In Part Motion for

19   Preliminary Injunction, this Court ordered Diablo to post a preliminary injunction bond in the

20   amount of $900,000.  (Dkt. No. 277.)

21        Rule 65(c) instructs an applicant seeking an injunction to make funds available "for the

22   payment of such costs and damages as may be incurred or suffered by any party who is found to

23   have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  To find that a party is

24   "wrongfully enjoined" the Court need not find that the injunction was "wrongfully issued," but only

25   that, upon final disposition of the issues, "the party enjoined had the right all along to do what it was

26   enjoined from doing." *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036 (9th

27   Cir. 1994).  Thus, to recover on the bond pursuant to Federal Rule of Civil Procedure 65(c), a party

28   must show that it was "wrongfully enjoined" and was injured due to issuance of a preliminary

injunction. *Id.* "[T]here is a rebuttable presumption that a wrongfully enjoined party is entitled to have the bond executed and recover provable damages up to the amount of the bond." *Id.* The claimed damages must be proven with "reasonable certainty." *Nintendo*, 16 F.3d at 1038.

Here, Netlist obtained a preliminary injunction which barred Diablo from "manufacturing, using, distributing and/or selling the Rush and Bolt integrated circuits manufactured by or obtained from Diablo, including any such Rush and Bolt integrated circuits contained in or provided along with the ULLtraDIMM module, the IBM eXFlash module, or any other product." (Dkt. No. 277 at 20.) The Court set a bond amount of $900,000 as the "approximate amount of the net profits Diablo would have received for the chipset sales affected by the preliminary injunction." (*Id.*) The enjoined products were the only products Diablo was manufacturing at the time. (McMullen Dec., Dkt. No. 464-6, at ¶ 6.)

Diablo appealed the Court's preliminary injunction order and sought a stay pending that appeal. On February 10, 2015, the Federal Circuit ordered that Diablo's motion to stay was denied.[1] (*See* Order of the USCA for the Federal Circuit as to Amended Notice of Appeal, Dkt. No. 331, at 3.) After the conclusion of the trial, on March 30, 2015, the Federal Circuit issued an order staying the preliminary injunction temporarily pending this Court's consideration of a motion to dissolve the injunction. (*See* Order of the USCA for the Federal Circuit, Dkt. No. 434.) On April 24, 2015, the Court ordered that the preliminary injunction was dissolved because the predicate claim had been rejected by the jury after a full presentation of the evidence at trial. (Dkt. No. 457.)

Diablo argues that its losses far exceeded the amount of the bond, and so it should recover the entire amount of the bond. Diablo offers evidence that projected gross profits from sales of chipsets for February and January 2015 was four times greater than the amount of the bond. (McMullen Dec. at ¶ 8.) Diablo did not sell the projected chipsets because outstanding orders were cancelled upon issuance of the preliminary injunction. (McMullen Dec. ¶6.) When the Court set the bond, it did so based, in part, on Netlist's expert's opinion that Diablo's profit margin was approximately 15

---

[1] The Federal Circuit granted SanDisk's motion to stay only insofar as the preliminary injunction was directed at SanDisk conduct that did not constitute aiding and abetting a violation by Diablo. (*See* Order of the USCA for the Federal Circuit as to Amended Notice of Appeal, Dkt. No. 331, at 3.)

2

United States District Court
Northern District of California

United States District Court
Northern District of California

1  percent. (Dkt. No. 261-1 at 6). At trial and in connection with this motion, Diablo presented

2  evidence that its expected profit margin for those sales exceeded 15 percent. (Trial Tr. 2311:11-15

3  [Parziale]; McMullen Dec. at ¶ 8.) Even taking the more conservative 15 percent figure as the

4  correct measure of net profits, based on the lost unit sales during the period of the injunction, the

5  evidence here supports a conclusion that Diablo's lost net profits on the chipsets alone approach or

6  exceed the amount of the bond.

7         In addition to lost profits, Diablo offers evidence that it was forced to lay off 20 percent of its

8  workforce, and take on millions in loans to cover employee payroll costs, both of which depleted its

9  capital. (McMullen Dec. at ¶¶ 14-15.) Diablo also estimates lost productivity of its remaining

10  employees due to the injunction at several hundred thousand dollars. (McMullen Dec. at ¶ 13.) In

11  addition, Diablo anticipates "ramp-up" costs in order to resume production of chipsets at the same

12  level prior to the preliminary injunction. (McMullen Dec. at ¶ 9.)

13         The Court finds that, based upon the jury's verdict finding that Diablo did not breach of the

14  Supply Agreement or Non-Disclosure Agreement, Diablo was wrongfully enjoined or restrained by

15  the preliminary injunction. As a consequence it is entitled to have the bond executed in its favor.

16  Diablo has offered evidence that the preliminary injunction, which halted production of its only

17  product on the market to its only customer, damaged Diablo in an amount that exceeds the

18  $900,000.00 bond.

19         Netlist contends that Diablo has not shown that sales were lost rather than merely deferred

20  and therefore has not met its burden to establish damages. However, Netlist's theory that sales were

21  deferred is just that—a theory, unsupported by evidence. *Cf. Nintendo*, 16 F.3d at 1038 (argument

22  that injunction merely delayed sales, and therefore damages number was inflated, was too

23  speculative to give credence). The theory is contrary to Diablo's evidence of cancelled sales, and is

24  contrary to Netlist's general contention during this litigation of the importance of capturing sales

25  before narrow windows of opportunity close in the rapidly changing world of semiconductor chips.

26  Further, Netlist's contention that Diablo was losing money on a net operating basis, and therefore

27  lacked overall net profits, does not answer the question of lost net profits from sales cancelled due to

28  the preliminary injunction.

3

Case 16-1062, Document 16, Page 58 Filed 12/08/2016

II. **CONCLUSION**

For the foregoing reasons, Diablo's Motion to Recover On Preliminary Injunction Bond is **GRANTED**. Defendant Diablo Technologies, Inc. may execute on the preliminary injunction bond, in the total sum of $900,000, immediately.

This Order terminates Dkt. No. 465.

**IT IS SO ORDERED.**

Date: September 1, 2015

_____

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

4

**FILED**

MAR 25 2015

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **NETLIST, INC.,** | Case No.: 13-cv-5962 YGR |
| Plaintiff, | **VERDICT FORM** |
| vs. | |
| **DIABLO TECHNOLOGIES, INC.,** | |
| Defendant. | |

**WE, THE JURY, UNANIMOUSLY AGREE** on the answers to the following questions and return them under the instructions of this Court as our verdict in this case. As used herein, "Netlist" refers to Plaintiff Netlist, Inc. and "Diablo" refers to Defendant Diablo Technologies, Inc.

### WITH RESPECT TO NETLIST'S TWO CLAIMS FOR BREACH OF CONTRACT:

**Question 1.**   Did Netlist and Diablo enter into a contract referred to as the Mutual Non-Disclosure Agreement?

___✓___ Yes   _____ No

*If you answered "Yes," proceed to Question 2. If you answered "No," skip to Question 4.*

**Question 2.**   Did Diablo breach the Mutual Non-Disclosure Agreement?

_____ Yes   ___✓___ No

*If you answered "Yes," proceed to Question 3. If you answered "No," skip to Question 4.*

**Question 3.**   Was Netlist harmed by that conduct?

_____ Yes   ___✓___ No

**Question 4.**   Did Netlist and Diablo enter into a contract referred to as the Development and Supply Agreement?

___✓___ Yes   _____ No

**Question 5.**   Did Diablo breach the Development and Supply Agreement?

_____ Yes   ___✓___ No

**Question 6.**   Was Netlist harmed by that conduct?

_____ Yes   ___✓___ No

*If you answered "Yes" to one or both of Questions 3 and 6, please answer the following question:*

**Question 7.**    What amount of damages to Netlist do you find were caused by Diablo's breach of the Mutual Non-Disclosure Agreement, the Development and Supply Agreement, or both?

$ _____○_____

**CONTINUE TO THE NEXT PAGE**

United States District Court
Northern District of California

2

### WITH RESPECT TO NETLIST'S CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS:

**Question 8:** Regarding **Alleged Trade Secret 1 – Normal Functional Mode and Secondary Mode**, please answer "Yes" or "No" as to each of the following questions with respect to the alleged trade secret:

| Element | Response |
|---|---|
| a. Was **Alleged Trade Secret 1** secret ? | Yes ___<br><br>No ✓ |
| b. Did **Alleged Trade Secret 1** have actual or potential independent economic value because it was secret? | Yes ___<br><br>No ___ |
| c. Did Netlist make reasonable efforts to keep **Alleged Trade Secret 1** secret? | Yes ___<br><br>No ___ |
| d. Did Diablo improperly use **Alleged Trade Secret 1?** | Yes ___<br><br>No ___ |

*If you answered "No" to any part of Question 8, skip to Question 11.*
*If you answered "Yes" to all parts of Question 8, please answer the following question:*

**Question 9.** Has Diablo proven that Netlist's claim for misappropriation of **Alleged Trade Secret 1** is barred, because Diablo obtained the claimed trade secret by proper means?

_____ Yes _____ No

*If you answered "Yes" to Question 9, skip to Question 11.*
*If you answered "No" to Question 9, please answer the following question:*

**Question 10.** Was Netlist harmed by Diablo's use of **Alleged Trade Secret 1?**

_____ Yes _____ No

**CONTINUE TO THE NEXT PAGE**

3

**Question 11.** Regarding **Alleged Trade Secret 2 – Control Information Extraction and Storage**, please answer "Yes" or "No" as to each of the following questions with respect to the alleged trade secret:

| Element | Response |
|---|---|
| a. Was **Alleged Trade Secret 2** secret ? | Yes ____<br><br>No ✓ |
| b. Did **Alleged Trade Secret 2** have actual or potential independent economic value because it was secret? | Yes ____<br><br>No ____ |
| c. Did Netlist make reasonable efforts to keep **Alleged Trade Secret 2** secret? | Yes ____<br><br>No ____ |
| d. Did Diablo improperly use **Alleged Trade Secret 2?** | Yes ____<br><br>No ____ |

*If you answered "No" to any part of Question 11, skip to Question 14.*
*If you answered "Yes" to all parts of Question 11, please answer the following question:*

**Question 12.** Has Diablo proven that Netlist's claim for misappropriation of **Alleged Trade Secret 2** is barred, because Diablo obtained the claimed trade secret by proper means?

_____ Yes _____ No

*If you answered "Yes" to Question 12, skip to Question 14.*
*If you answered "No" to Question 12, please answer the following question:*

**Question 13.** Was Netlist harmed by Diablo's use of **Alleged Trade Secret 2**?

_____ Yes _____ No

**CONTINUE TO THE NEXT PAGE**

United States District Court
Northern District of California

4

United States District Court
Northern District of California

**Question 14.** Regarding **Alleged Trade Secret 3 – Access Control Architecture**, please answer "Yes" or "No" as to each of the following questions with respect to the alleged trade secret:

| Element | Response |
|---|---|
| a. Was **Alleged Trade Secret 3** secret ? | Yes _____  No ✓ |
| b. Did **Alleged Trade Secret 3** have actual or potential independent economic value because it was secret? | Yes _____  No _____ |
| c. Did Netlist make reasonable efforts to keep **Alleged Trade Secret 3** secret? | Yes _____  No _____ |
| d. Did Diablo improperly use **Alleged Trade Secret 3?** | Yes _____  No _____ |

*If you answered "No" to any part of Question 14, skip to Question 17.*
*If you answered "Yes" to all parts of Question 14, please answer the following question*:

**Question 15.** Has Diablo proven that Netlist's claim for misappropriation of **Alleged Trade Secret 3** is barred, because Diablo obtained the claimed trade secret by proper means?

_____ Yes _____ No

*If you answered "Yes" to Question 15, skip to Question 17.*
*If you answered "No" to Question 15, please answer the following question*:

**Question 16.** Was Netlist harmed by Diablo's use of **Alleged Trade Secret 3**?

_____ Yes _____ No

**CONTINUE TO THE NEXT PAGE**

5

**Question 17.** Regarding **Alleged Trade Secret 4 – Addressable Registers to Hold ISwitch Configuration Information,** please answer "Yes" or "No" as to each of the following questions with respect to the alleged trade secret:

| Element | Response |
|---|---|
| a. Was **Alleged Trade Secret 4** secret ? | Yes ___<br><br>No ✓ |
| b. Did **Alleged Trade Secret 4** have actual or potential independent economic value because it was secret? | Yes ___<br><br>No ___ |
| c. Did Netlist make reasonable efforts to keep **Alleged Trade Secret 4** secret? | Yes ___<br><br>No ___ |
| d. Did Diablo improperly use **Alleged Trade Secret 4**? | Yes ___<br><br>No ___ |

*If you answered "No" to any part of Question 17, skip to Question 20.*
*If you answered "Yes" to all parts of Question 17, please answer the following question:*

**Question 18.** Has Diablo proven that Netlist's claim for misappropriation of **Alleged Trade Secret 4** is barred, because Diablo obtained the claimed trade secret by proper means?

_____ Yes _____ No

*If you answered "Yes" to Question 18, skip to Question 20.*
*If you answered "No" to Question 18, please answer the following question:*

**Question 19.** Was Netlist harmed by Diablo's use of **Alleged Trade Secret 4**?

_____ Yes _____ No

**CONTINUE TO THE NEXT PAGE**

**Question 20.** Regarding **Alleged Trade Secret 5 – ASIC Control of Operation Modes and States,** please answer "Yes" or "No" as to each of the following questions with respect to the alleged trade secret:

| Element | Response |
|---|---|
| a. Was **Alleged Trade Secret 5** secret ? | Yes ___<br><br>No ✓ |
| b. Did **Alleged Trade Secret 5** have actual or potential independent economic value because it was secret? | Yes ___<br><br>No ___ |
| c. Did Netlist make reasonable efforts to keep **Alleged Trade Secret 5** secret? | Yes ___<br><br>No ___ |
| d. Did Diablo improperly use **Alleged Trade Secret 5**? | Yes ___<br><br>No ___ |

*If you answered "No" to any part of Question 20, skip to Question 23.*
*If you answered "Yes" to all parts of Question 20, please answer the following question:*

**Question 21.** Has Diablo proven that Netlist's claim for misappropriation of **Alleged Trade Secret 5** is barred, because Diablo obtained the claimed trade secret by proper means?

_____ Yes _____ No

*If you answered "Yes" to Question 21, skip to Question 23.*
*If you answered "No" to Question 21, please answer the following question:*

**Question 22.** Was Netlist harmed by Diablo's use of **Alleged Trade Secret 5**?

_____ Yes _____ No

**CONTINUE TO THE NEXT PAGE**

7

**Question 23.** Regarding **Alleged Trade Secret 6 – Configuring the Chipset to Perform Write-Leveling,** please answer "Yes" or "No" as to each of the following questions with respect to the alleged trade secret:

| Element | Response |
|---|---|
| a. Was **Alleged Trade Secret 6** secret ? | Yes ____<br><br>No ✓ |
| b. Did **Alleged Trade Secret 6** have actual or potential independent economic value because it was secret? | Yes ____<br><br>No ____ |
| c. Did Netlist make reasonable efforts to keep **Alleged Trade Secret 6** secret? | Yes ____<br><br>No ____ |
| d. Did Diablo improperly use **Alleged Trade Secret 6?** | Yes ____<br><br>No ____ |

*If you answered "No" to any part of Question 23, skip to Question 26.*
*If you answered "Yes" to all parts of Question 23, please answer the following question*:

**Question 24.** Has Diablo proven that Netlist's claim for misappropriation of **Alleged Trade Secret 6** is barred, because Diablo obtained the claimed trade secret by proper means?

_____ Yes _____ No

*If you answered "Yes" to Question 24, skip to Question 26.*
*If you answered "No" to Question 24, please answer the following question*:

**Question 25.** Was Netlist harmed by Diablo's use of **Alleged Trade Secret 6**?

_____ Yes _____ No

**CONTINUE TO THE NEXT PAGE**

United States District Court
Northern District of California

8

**Question 26.** Regarding **Alleged Trade Secret 7 – ODT Termination Values,** please answer "Yes" or "No" as to each of the following questions with respect to the alleged trade secret:

| Element | Response |
|---|---|
| a. Was **Alleged Trade Secret 7** secret ? | Yes ____  <br> No ✓ |
| b. Did **Alleged Trade Secret 7** have actual or potential independent economic value because it was secret? | Yes ____  <br> No ____ |
| c. Did Netlist make reasonable efforts to keep **Alleged Trade Secret 7** secret? | Yes ____  <br> No ____ |
| d. Did Diablo improperly use **Alleged Trade Secret 7**? | Yes ____  <br> No ____ |

*If you answered "No" to any part of Question 26, skip to Question 29.*
*If you answered "Yes" to all parts of Question 26, please answer the following question:*

**Question 27.** Has Diablo proven that Netlist's claim for misappropriation of **Alleged Trade Secret 7** is barred, because Diablo obtained the claimed trade secret by proper means?

_____ Yes _____ No

*If you answered "Yes" to Question 27, skip to Question 29.*
*If you answered "No" to Question 27, please answer the following question:*

**Question 28.** Was Netlist harmed by Diablo's use of **Alleged Trade Secret 7**?

_____ Yes _____ No

**CONTINUE TO THE NEXT PAGE**

9

**Question 29.** Regarding **Alleged Trade Secret 8 – Dynamic Control and Timing of ODT in ISwitch,** please answer "Yes" or "No" as to each of the following questions with respect to the alleged trade secret:

| Element | Response |
| --- | --- |
| a. Was **Alleged Trade Secret 8** secret ? | Yes ___<br><br>No ✓ |
| b. Did **Alleged Trade Secret 8** have actual or potential independent economic value because it was secret? | Yes ___<br><br>No ___ |
| c. Did Netlist make reasonable efforts to keep **Alleged Trade Secret 8** secret? | Yes ___<br><br>No ___ |
| d. Did Diablo improperly use **Alleged Trade Secret 8**? | Yes ___<br><br>No ___ |

*If you answered "No" to any part of Question 29, skip to Question 32.*
*If you answered "Yes" to all parts of Question 29, please answer the following question:*

**Question 30.** Has Diablo proven that Netlist's claim for misappropriation of **Alleged Trade Secret 8** is barred, because Diablo obtained the claimed trade secret by proper means?

_____ Yes _____ No

*If you answered "Yes" to Question 30, skip to Question 32.*
*If you answered "No" to Question 30, please answer the following question:*

**Question 31.** Was Netlist harmed by Diablo's use of **Alleged Trade Secret 8**?

_____ Yes _____ No

**CONTINUE TO THE NEXT PAGE**

10

**Question 32.** If you answered "Yes" to any of **Questions 10, 13, 16, 19, 22, 25, 28, or 31** what amount of damages do you award Netlist for the harm caused by Diablo's improper use of the Alleged Trade Secret(s)?

$_____

**Question 33.** If you answered "Yes" to any of **Questions 10, 13, 16, 19, 22, 25, 28, or 31** do you find by clear and convincing evidence that Diablo's improper use of the Alleged Trade Secret(s) was willful and malicious?

\_\_\_\_\_ Yes  \_\_\_\_\_ No

## WITH RESPECT TO NETLIST'S CLAIM FOR CORRECTION OF INVENTORSHIP:

**Question 34.** Has Netlist proven that Dr. Hyun Lee should be added as a named inventor of the '917 patent?

\_\_\_\_\_ Yes  \_✓\_\_\_ No

**CONTINUE TO THE NEXT PAGE**

United States District Court
Northern District of California

### WITH RESPECT TO NETLIST'S CLAIM FOR TRADEMARK INFRINGEMENT

**Question 35.** Has Netlist proven its claim of trademark infringement against Diablo?

_____✓_____ Yes     _____ No

**Question 36.** If you answered "Yes" to **Question 35**, do you find that Netlist is entitled to nominal damages not to exceed $1.00 for trademark infringement? If yes, state amount.

_____✓_____ Yes     _____ No     $ __1.0 0__

### WITH RESPECT TO NETLIST'S CLAIM FOR FALSE AND MISLEADING ADVERTISING

**Question 37.** Has Netlist proven its claim of false and misleading advertisement against Diablo?

_____✓_____ Yes     _____ No

**Question 38.** If you answered "Yes" to **Question 37**, do you find that Netlist is entitled to nominal damages not to exceed $1.00 for false and misleading advertising? If yes, state amount.

_____✓_____ Yes     _____ No     $ __1.00__

**Please sign, date the verdict form and give it to the courtroom deputy.**

**DATE:**   3-25-15

**PRESIDING JUROR NO.** __8__

__Pat Mulroy__
**PRESIDING JUROR SIGNATURE**

12

A0033

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2015, I electronically filed the

foregoing OPENING BRIEF OF PLAINTIFF-APPELLANT

NETLIST, INC.  with the Court's CM/ECF filing system, which constitutes

service, pursuant to Fed. R. App. P. 25(c), Fed. Cir. R. 25(a), and the Court's

Administrative Order Regarding Electronic Case Filing 6(A) (May 17, 2012).


*/s/ Sean C. Cunningham*
Sean C. Cunningham
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
619.699.2700

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).  The brief contains 6,839 words, as calculated by the word count of the word processing system used in preparing it, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).  The brief has been prepared in Microsoft Word 2010 in Times New Roman 14 point font.

By: */s/ Sean C. Cunningham*
    Sean C. Cunningham
    DLA PIPER LLP (US)
    401 B Street, Suite 1700
    San Diego, CA 92101-4297
    619.699.2700